CROSS COMPANY, a Michigan corporation, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 14237.

United States Court of Appeals
Sixth Circuit.

Feb. 2, 1961.

Rehearing Denied April 15, 1961.

See 288 F.2d 188.

Robert C. Winter, Detroit, Mich. (Robert C. Winter, H. William Butler, David P. Wood, Clark, Klein, Brucker & Waples, Detroit, Mich., on the brief), for petitioner.

Melvin Pollack, N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin Pollack and Hans J. Lehmann, Attys., N. L. R. B., Washington, D. C., on the brief), for respondent.

Before SIMONS, Senior Judge, and MARTIN and O'SULLIVAN, Circuit Judges.

SIMONS, Senior Circuit Judge.

The petition for review seeks to set aside an order of the National Labor Relations Board which requires The Cross Company to bargain with Local 155 of the International Union of United Automobile, Aircraft and Agricultural Implement Workers of America, as the collective bargaining representative of certain employees of the company at its Fraser, Michigan, plant. The Board responds with a request that its order be enforced.

Cross charges that it has no legal duty to bargain with the Union as the representative of its employees because of the character of the Union's campaign in an election for decertification as the representative of its employees. It becomes necessary, therefore, to review the circumstances of the election the validity of which Cross here assails. If the election was valid, there can be no question as to the validity of the Board's order. If, however, the election is voided, the order in all its aspects must be set aside.

Pursuant to an earlier representation election held in April, 1957, Local 155 was duly certified as collective bargaining representative of the Cross Company's production and maintenance workers at its Fraser plant. Thereupon, Cross and the Union entered into bargaining negotiations resulting in a contract signed in August, 1957, which expired, by its own terms, on October 1, 1958. However, in September and early October of that year, a group of Cross employees, claiming to represent over 30% of the employees at Fraser, petitioned the Board for an election to decertify Local 155 as bargaining agent. Cross and one Chris Youngjohn, as agent and attorney for the employee group seeking decertification, agreed with the approval of the Board's Regional Director that a consent election be held on November 12, 1958, to determine whether a majority of employees in the designated bargaining unit desired Local 155 to continue to represent them. The Union won the election, receiving a total of 150 unchallenged ballots as opposed to 134 unchallenged ballots against the Union. There were five challenged ballots. Objections to the election were filed with the Board by Youngjohn and the company, based upon alleged improper electioneering by the Union. The principal objection upon which they sought to have the election invalidated was based upon a handbill distributed by the Union to the voting employees on the morning of the election which contained false statements and was circulated at a time when the objectors had no opportunity to challenge the misstatements. The complete text of the handbill, printed in large type, was as follows:

"Remember 1949?

"That was when the Cross Company laid off over 100 workers—and recalled only three of them!

"Cross says that if the union is decertified it will respect seniority and all other rights won by the union. That's not true. Right now—1958—engineers are being laid off *out of seniority!*

"Guard your rights, vote 'Yes' to retain the UAW. Don't Let It Happen In '58!

"The best insurance you have is your membership in the UAW and the protection of a contract. Don't let the company talk you into throwing away these rights for vague promises that can be broken at any time.

"Here's a sample of your benefits under the UAW contract. Under the company SUB plan, a typical payment was $8.29 received by a foreman recently. Compare this with $1,156 collected by one man under the union severance plan after 11 years at Cross!

"Vote 'Yes' for the UAW.
Local 155 UAW"

Printed opposite this injunction is a heavily inked device that may be that of a machine, with a large group of persons

showing, and upon it, in very clear and large capitals, is the legend "No Recalls" and underneath that, designating this group, is the additional legend "Laid Off Cross Workers."

Upon considering the layoff legends in the handbill, the Board's Regional Director undertook an investigation. He found that the company's records indicated that the statements concerning the 1949 layoff were false. These records, not disputed, indicated that in fact the 1949 company payroll never exceeded 80 men; that only 29 were laid off, 8 of whom were recalled in 1949, and 18 at various times thereafter. Of the 26 employees recalled, 8 availed themselves of the privilege. The Regional Director further found that the figures quoted in relation to compensation paid by the company and by the Union, under their respective supplementary unemployment benefit plans were actual payments but that neither was typical, that the average under the company plan was approximately $200.00 and that the two figures constituted a comparison of isolated instances.

However, despite the obvious misrepresentations in the handbill, the Regional Director declined to investigate the accuracy of the company records, expressing the belief that under the circumstances presented, even if the facts stated in the handbill were false, the decertification election should not be invalidated, as the statements were within the limits of permissible election propaganda. He recommended to the Board that the objections be overruled and that the Board certify that Local 155 had been selected by a majority of the employees in an appropriate bargaining unit. Timely objections were made by Cross and Youngjohn to the report and recommendation and the case was submitted to the Board. It agreed with the Regional Director that the election should not be set aside.

Affidavits of twenty nine employees were submitted to the Board which stated that the affiants had voted for retention of the Union but would have voted to the contrary if they had known the true facts concerning the 1949 layoff. Also submitted to the Board was the affidavit of Ferguson, a member of the Shop Committee of the local during the year 1958. This affidavit stated that on the day preceding the election he was shown a handbill to be circulated the next day by a member of the Shop Committee and Chief Steward of the Union. When Ferguson inquired into the truthfulness of the handbill and the legality of using it, the steward merely replied "Who cares?"

We are aware of the rule of the Board that post-election changes of mind will not be considered. This suggests the rule frequently applied in jury cases that a juror may not impeach his verdict.

But the Board is an Administrative Agency and not a court and while its judgments are entitled to great respect, evolving from wide experience, it is not infallible. In elections the parties are not under oath and receive no instructions from the court. In all fairness, the Board might well have given thought to the objecting members of the Union. It did, however, rely upou a leaflet mailed by the Union to various employees, in September, 1958, approximately two months prior to the election which, it is alleged, made some misrepresentations included in the election handbill. But repetition is emphasis and the cumulative effect of the charges by the Union should not lightly have been dismissed.

The Board affirmed the Regional Director's view that the election should not be set aside. It reasoned that while it had no doubts as to the falsity of the facts stated in the handbill, they had little relationship to the true facts. It stated that the Board had on numerous occasions ruled that mere falsity alone does not constitute campaign trickery warranting the setting aside of an election. Is is only when the parties deliberately misstate material facts, which are within its special knowledge, and where the employees are unable to properly evaluate these statements, the Board will set aside an election and that the statements comparing Unemployment Benefits were, at most, an exaggeration and ignored its

own reliance upon allegedly similar misrepresentations in regard to the 1949 layoffs, made by the Union in September, 1958. It concluded that the objections to the Regional Director's report and recommendation were without merit and certified Local 155 as the collective bargaining representative of the Cross employees. A petition to reconsider was filed with the Board and denied on June 22, 1959. In the meanwhile, on June 24, 1959, the employees' decertification group filed a petition for another election. This was dismissed by the Regional Director on July 7th, on the ground that less than one year had passed since the prior certification. On August 9, 1959, the Board sustained the Regional Director's dismissal. In order to obtain a judicial review of the validity of the November 12, 1958 decertification election, the company was faced with a perplexing dilemma. It sought a writ of mandamus from this court, on October 19, 1959. It was denied. Cross Company v. Leedom et al., 6 Cir., 271 F.2d 247. The company then had the alternatives either to abandon its claim therefor or else refuse to bargain and await filing of an order by the Board and subsequent enforcement proceedings in the Court of Appeals. This is the case now before us. It was followed by a strike commenced on August 4, 1959.

On February 26, 1951, the Supreme Court of the United States announced its decision in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 465, 95 L.Ed. 456, with an opinion by Mr. Justice Frankfurter of great lucidity and care. It reviewed the legislative history of the Labor Act, 29 U.S.C.A. § 141 et seq., and concluded that two conclusions emerged therefrom. One is the identity of aim of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., and the Taft-Hartley Act regarding the proof with which the Labor Board must support a decision; the other is that now Congress has left no room for doubt as to the kind of scrutiny which the Court of Appeals must give the record before the Board to satisfy itself that the Board's order rests upon adequate proof. It said:

"Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

It stated further:

"The legislative history of these Acts demonstrates a purpose to impose on courts a responsibility which has not always been recognized."

And again:

"We should fail in our duty to effectuate the will of Congress if we denied recognition to expressed Congressional disapproval of the finality accorded to Labor Board findings by some decisions of this and lower courts, or even of the atmosphere which may have favored these decisions.

"We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. * * *

"Our power to review the correctness of application of the present standard ought seldom to be called into action. Whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals. This Court will intervene only in what ought to be the rare instance when the standard ap-

pears to have been misapprehended or grossly misapplied."

In the foregoing observations, the Court spoke with unanimity and the concept there elucidated was immediately applied in National Labor Relations Board v. Pittsburgh SS. Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479.

The Universal Camera case, supra, recognizes that not all the Courts of Appeals have accorded finality to the Board's decisions, and where there has been recognizable falsity in election campaign statements, at a time when they were impossible of correction, the Seventh and District of Columbia Circuit Courts of Appeals have not departed from more conventional standards. Allis-Chalmers Mfg. Co. v. N. L. R. B., 7 Cir., 261 F.2d 613; Celanese Corp. of America v. N. L. R. B., 7 Cir., 279 F.2d 204; and International Union of Electrical, Radio and Machine Workers, AFL-CIO v. N. L. R. B., D.C.Cir., —— F.2d ——, and the Labor Board itself recognizes that there are limits to the Board's discretion. Gummed Products Co., 112 N.L.R.B. 1092.

 While there is here a petition of the National Labor Relations Board for a decree enforcing its order, we conclude that the primary question is whether the Board's order should be enforced. It is the basic issue upon which all other questions in the case depend. We think the decertification election must be voided. We are unable to follow the argument of the Board that the misrepresentations of the Union were fair; that they were mere propaganda, half-truths, and legitimate campaign representations. There should have been another election not subject to the infirmities here disclosed.

The Board acted unreasonably and, therefore, arbitrarily. The certification of the Union, as the representative of the Cross employees, is vacated, and the enforcement of the Board's order is denied. The case is remanded to the National Labor Relations Board for further consideration not inconsistent with the views here expressed.

Reversed and remanded.