**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOUISVILLE CHAIR COMPANY, Inc., Respondent.**

**No. 17893.**

United States Court of Appeals
Sixth Circuit.

Dec. 1, 1967.

George B. Driesen, N. L. R. B., Washington, D. C., for petitioner, Arnold Ordman. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, J. Richard Theising, Atty., N. L. R. B., Washington, D. C., on the brief.

Martin Raphael, New York City, for intervenor.

James U. Smith, Jr., Louisville, Ky., for respondent, Louis E. Woolery, Louisville, Ky., Stuart Rothman, Washington, D. C., on the brief, Smith & Smith, Louisville, Ky., Royall, Koegel, Rogers & Wells, Washington, D. C., of counsel.

Before EDWARDS, CELEBREZZE and PECK, Circuit Judges.

CELEBREZZE, Circuit Judge.

The National Labor Relations Board brings this petition to enforce its order against Respondent Louisville Chair Company, Inc. United Furniture Workers of America, AFL–CIO, Local 236, was granted permission to intervene. The Board found that in opposing the organization of its workers by Local 236, United Furniture Workers of America, AFL–CIO, the Respondent violated Sections 8(a) (1), (3), and (5) of the Labor Management Relations Act, 29 U.S. C. § 158(a) (1), (3) and (5). The Board ordered [1] the Company to cease its unfair labor practices, to bargain collectively with the Union, to reinstate the striking employees with back pay, and to offer employment with back pay to Joseph E. Sweet, who had been refused employment because of his past Union activities. We grant enforcement of the Board's order.

1) Violations of § 8(a) (1) and (3).

The charge that the Respondent restrained or coerced its employees in the exercise of their right to self-organization in violation of § 8(a) (1) is based upon two incidents. In one a Company foreman, Pry, engaged an employee, Vittitow, in what the Trial Examiner characterized as a "bantering" conversation. In the course of the conversation Pry asked Vittitow how the Union meeting had gone the night before. Vittitow replied that it had gone all right but that he had not seen anything of Pry or his spies there. Pry retorted that "his spies were smart for staying out of the Union and he said anybody involved in the Union would definitely be fired." The Trial Examiner found that Pry did not temper the remark either by additional comment or manner of delivery and, therefore, concluded that Pry's conduct tended to interfere with the free exercise of employees' rights under the Act.

The second incident concerned discriminatory application of a rule against solicitation during working hours. A foreman reported to the Respondent's general superintendent, Wedding, that he had observed an employee, Spencer, showing some Union buttons to other employees during working hours. The following day Wedding went to Spencer's department and stood for about ten minutes on a landing ten feet behind Spencer's work station from which position he observed Spencer showing a Union button, which Spencer was wearing, to Green, a deaf mute employee who worked beside him. Spencer said something to Green similar to "you should be wearing one of these." Green continued to work; Spencer, whose job was to turn sewn chair back covers inside out and to sort them, paused in his work while showing the button to Green and talking to him. Wedding estimated that the incident took no more than fifteen or twenty seconds.

After observing this exchange, Wedding approached Spencer and told him that if he would spend more time on his work and less on Union activity, they would get along better and warned Spencer that if he was caught passing out Union buttons or literature on Company time, he would be discharged. Wedding then told the department foreman to inform him if Spencer engaged in any Union activity whatsoever on Company time. With respect to momentary pauses in work, Wedding testified on cross-examination:

"Q. Was it unusual for an employee regardless of what he does now to take a five second interval between turning backs occasionally?

"A. It would be very unusual for an employee to take five seconds out to engage in Union activity.

"Q. That's not my question, Mr. Wedding.

"A. If an employee took five seconds out just to stop for five seconds I wouldn't say anything to him, but if he's engaged in Union activity he's going to get it.

"Q. What if he took ten seconds out just to stop?

1. Louisville Chair Company, Inc., 161 N.L.R.B.—(No. 31) (1965).

"A. I wouldn't say anything about that.

"Q. How about twenty, how about a minute?

"A. No. If he's engaged in Union activity he would.

"Q. But if he was engaging in Union activity you would toss him right out of the joint?

"A. I might, it all depends. I have warned them, I warn them usually my procedure would be to warn them as in the case with Saul Spencer."

From this testimony it was obvious that the Company permitted momentary pauses in work and that employees were generally free to talk while working, as long as they worked efficiently. Therefore, the Trial Examiner concluded that the only vice Wedding perceived in Spencer's conduct was that the pause and talking were utilized for Union activity; hence, he determined that Wedding's threat of discharge unfairly enforced the Respondent's no solicitation rule.

Respondent's violation of § 8(a) (3) is predicated upon its refusal to employ Joseph E. Sweet because of his Union activity at his previous place of employment. Sweet, upon referral by the State Employment Service, applied for a job at Respondent's factory at the height of the controversy concerning the legality of the representation election. On his application form Sweet listed Huttig Sash & Door Company, Inc., as his last place of employment, and under the heading, "Why did you leave?", he wrote the single word "Discharge." After looking over the application, Miss Ohmann, Respondent's personnel director, asked Sweet why he was discharged by Huttig. When informed that Union trouble had occurred at Huttig and that Sweet was fired because he was fulfilling his duties as a chief steward of the Union,[2] she told him that she could not hire him because the Respondent was having Union problems too. Other evidence was presented, but the Trial Examiner concluded that the refusal to hire Sweet was based on his Union activity.

Respondent concedes that sufficient evidence was presented to support the Board's findings in these matters. But the Respondent contends on the one hand that the violations of § 8(a) (1) are so minor and trivial as not to warrant the issuance of an order and on the other hand that since Sweet has been reinstated by Huttig an offer of employment to him would be a useless gesture. The Act provides that upon a finding " * * * that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board * * * *shall* issue and cause to be served on such person an order * *." 29 U.S.C. § 160(c) (emphasis added). In International Woodworkers of America, AFL–CIO Local 3–10 v. N. L. R. B., 380 F.2d 628 (D.C. Cir. 1967), this provision was interpreted as a mandatory requirement that the Board issue an order upon the finding of an unfair labor practice. Whether the provision is mandatory or discretionary, however, we need not decide; for we find that the issuance of an order under the facts of the instant case would not be an abuse of the Board's discretion.

Respondent's reliance upon N. L. R. B. v. Tennessee Coach Company, 191 F.2d 546 (6th Cir. 1951), and Pittsburgh Steamship Company v. N. L. R. B., 180 F.2d 731 (6th Cir. 1950), aff'd 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479 (1951), for the proposition that a remedial order is inappropriate when unlawful remarks by supervisors to employees are of an isolated nature is misplaced. In both of those cases the actions of the employer were held not to be unlawful. Pittsburgh Steamship Company concerned an employer's letter to his employees setting out his position on a representation election. The letter was held not coercive and not a misrepresentation of the facts. Tennessee Coach Company concerned an-

---

2. An order of the Board issued sometime after Sweet's application at Louisville Chair to require Huttig to reinstate Sweet with back pay. Huttig Sash & Door Company, Inc., 154 N.L.R.B. 125 (1965).

tiunion statements of supervisors, but the Court found that the statements were not accompanied by any threats or coercion. Here the antiunion actions of Respondent's supervisors were accompanied by a threat of discharge, which is one of the most effective means of coercion. On review of the entire record we are satisfied that when these acts are coupled with the Respondent's refusal to hire Union advocates and its continued refusal to bargain with Local 236, enough substantial evidence is presented to justify the issuance of the Board's order as to these matters. Cf. Sheffer Corporation v. N. L. R. B., 380 F.2d 1007 (6th Cir. 1967).

Also Respondent's contention that Sweet's reinstatement by Huttig renders moot the back pay order as to him is not supportable. It seems clear that even compliance with an order does not deprive the Board of its right to a decree enforcing that order. N. L. R. B. v. Mexia Textile Mills, Inc., 339 U.S. 563, 70 S.Ct. 833, 94 L.Ed. 1067 (1960); N. L. R. B. v. Heck's, Inc., 369 F.2d 370 (6th Cir. 1966). Here facts necessary to determine the amount of back pay for which the Respondent is liable were neither raised nor resolved in the proceedings before the Board. Such matters can better be resolved in compliance proceedings. Cf. N. L. R. B. v. Talladega Cotton Factory, 213 F.2d 209, 40 A.L.R.2d 404 (5th Cir. 1954).

### 2) Violations of § 8(a) (5).

On May 27, 1965, a representation election was held among the Respondent's furniture workers. Local 236 received a majority of the votes cast in the election, but the Respondent raised objections to the conduct of the election and to certain discrepancies in the election. After an administrative investigation, without a hearing, the Regional Director overruled the Respondent's objections and on July 16, 1965, certified Local 236 as the employees' collective bargaining representative. Respondent appealed the Regional Director's decision to the Board, but no stay in the certification was sought or ordered. Nevertheless, the Respondent refused to bargain with Local 236 in the interim and still refuses to bargain with it. On August 17, 1965, Local 236 called a strike against the Respondent. On September 1, 1965, the Board denied the Respondent's request for review of the Regional Director's certification. Thereafter, on October 21, 1965, the General Counsel instituted the unfair labor practice proceeding that resulted in the order under review.

The Respondent contends that it had no duty to bargain with Local 236 because of the discrepancies in the election and that, in any event, it had a right to a hearing concerning its objections. Also, the Respondent contends that the strike on August 17th was a sympathy strike, a matter more fully explored later in this opinion, and not an unfair labor practice strike. The Board found, however, that the strike was an unfair labor practice strike and that the Respondent's objections to the election did not raise any substantial or material issues that would warrant a hearing.

### The Union's Showing of Interest.

Respondent first objected to the authorization cards that were submitted by the Union to make a showing of interest. It appears that the cards indicated the International Union as the signer's choice of collective bargaining representative and made no mention of Local 236. The Regional Director overruled the objection and proceeded with the election. We find no merit to Respondent's suggestion that the failure to specify Local 236 on the authorization cards vitiates the election.

A showing of interest is not a jurisdictional prerequisite to an election. It is merely a step in the screening process to facilitate the Board's determination under Section 9(c) that a sufficient question of representation is presented to warrant the expense and effort of an election. N. L. R. B. v. National Truck Rental Co., 99 U.S.App.D.C. 259, 239 F. 2d 422 (1956); N. L. R. B. v. Swift and Company, 294 F.2d 285 (3rd Cir. 1961). The election decides the substantive issue

whether the Union represents a majority of the employees; no statutory purpose would be served by allowing the parties to litigate the question of a showing of interest at a pre-election hearing. See N. L. R. B. v. J. I. Case Co., 201 F.2d 597, 600 (9th Cir. 1953). In the instant case by the time of the election the voters were fully aware that Local 236 was the organization in question, and the results of the election resolved the question of representation in its favor.

Misleading Campaign Propaganda.

Two weeks before the election the Union distributed a handbill stating in part: "The Company's gross profit for the last fiscal year was—$1,730,111.00— VOTE YES. Lets get our share of the pie!" A second handbill of similar content was distributed a few days before the election. The statement concerning the Company's gross profit was literally true, but Respondent contends that it was misleading since it implied that the full amount was distributable net income, whereas the Company's actual net income was only $244,198.00.

Presumably both figures were available to the Union from a Dun and Bradstreet report on the Respondent, but neither figure accurately reflected the funds actually available for distribution. Faced with a choice between two ambiguous figures the Union could legitimately choose the one favorable to its position. Although its use of the gross profits figure was ambiguous and susceptible to different interpretations, ambiguity in campaign propaganda is not sufficient by itself to vitiate an election. Hollywood Ceramics Co., 140 N.L.R.B. 221 (1962). Here, the information in the handbills did not concern material within the special knowledge of the Union, N. L. R. B. v. Trancoa Chemical Corporation, 303 F.2d 456, 3 A.L.R.2d 879 (1st Cir. 1962), and it was not disseminated at a time or in a manner calculated to deprive the Respondent of an opportunity to reply. Cross Company v. N. L. R. B., 286 F.2d 799 (6th Cir. 1961); N. L. R. B. v. Trinity Steel Co., Inc., 214 F.2d 120 (5th Cir. 1954).

Respondent, contends, however, that regardless of the amount of time available to reply it could not effectively refute the misleading implications of the handbill because of the complexity of the subject involved. To support this contention Respondent attempted to introduce evidence before the Board concerning the complexity of corporation accounting procedures and the educational level of its employees. The Board rejected this proof, and we are not persuaded by the argument. Having deliberately by-passed its opportunity to reply, the Respondent cannot now contend that the Union campaign material, which was refutable, prevented the exercise of a free choice by its employees in the election of their bargaining representative. Cf. Ralston Purina Co., 147 N.L. R.B.—(No. 65) (1964).

The Election.

The representation election on May 27, 1967, was conducted by the usual Board procedure and resulted in a vote of 187 for and 112 against the Union. Both parties had an observer to check the names of voters as they cast their ballot. Prior to the election a list of 307 eligible voters was compiled. Although 302 ballots were in the ballot boxes, only 300 names were checked off the eligibility list by the Company and Union observers. The Board refused to set aside the election, however, because in its opinion the two ballots could not have possibly affected the outcome of the election. No plausible suggestion was made how the presence of the two extra ballots indicates that something was intrinsically wrong with the election process. The burden of proof in this respect rested upon the Respondent and not the Board; we find that Respondent has failed to meet that burden. N. L. R. B. v. Mattison Machine Works, 365 U.S. 123, 81 S.Ct. 434, 5 L.Ed.2d 455 (1961).

The Denial of a Hearing.

The issues concerning the Union's showing of interest, the campaign material, and the discrepancy in

the ballots were all resolved against the Respondent by the Regional Director and the Board without affording the Respondent a hearing. Section 102.69(e) (1), 29 C.F.R. provides that a hearing should be granted on exceptions to a consent election only when those "exceptions raise substantial and material factual issues." This Court has recently said that a party does not satisfy that requirement merely by questioning "the interpretation and inferences placed upon the facts by the Regional Director." N. L. R. B. v. Tennessee Packers, Inc., Frosty Morn Division, 379 F.2d 172, 178 (6th Cir. 1967). In further defining the party's responsibility in this respect, the Court stated:

"It is incumbent upon the party seeking a hearing to clearly demonstrate that factual issues exist which can only be resolved by an evidentiary hearing. The exceptions must state the specific findings that are controverted and must show what evidence will be presented to support a contrary finding or conclusion." 379 F.2d at 178.

We are of the opinion that the Respondent did not satisfy this requirement; therefore, the Board was within its discretion in denying a hearing on these matters.

### The Strike.

After certification of Local 236 by the Regional Director representatives of the Union requested a meeting with the Respondent to begin negotiations for a collective bargaining agreement. Although no stay of the certification had been requested or granted, the Respondent refused to meet with the Union representatives because of its pending appeal to the Board. On August 5, 1965, the Union sent Respondent a telegram stating that its refusal to bargain was an unfair labor practice and that the Union members had voted unanimously to strike.

Since no stay in the certification had been granted, the Respondent's refusal to bargain was undoubtedly an unfair labor practice. 29 U.S.C. § 153 (b); Cf. Old King Cole, Inc. v. N. L. R. B., 260 F.2d 530 (6th Cir. 1958) (in relation to a similar provision in § 10(g) concerning Board orders, 29 U.S.C. § 160). But the Union did not strike at this time. Instead a meeting between Respondent and the Union under the auspices of the Federal Mediation and Conciliation Service was held on August 9, 1965. Before the meeting Respondent insisted upon both parties signing a memorandum that this was "an off-the-record meeting * * * and will not be used in any way by either party in any pending or future proceeding." In spite of its prior insistence as to the off-the-record nature of the proceeding, Respondent now contends that a tentative agreement reached at the meeting, by which the Union representatives agreed not to strike until the Board had acted on the Respondent's appeal, prevents the Union's strike on August 17, 1965, from being an unfair labor practice strike.

Respondent insists that the strike on August 17th was a sympathy strike in support of Teamsters' Local 89, which represented Respondent's truck drivers.[3] Respondent and the Teamsters' Local had been negotiating since February, 1965. A leaflet advertising Local 236's August 4th meeting indicated that joint action with the Teamsters' Local was contemplated. After the Teamsters' picket line was established at 11:00 a. m. on August 17th, a meeting of the Local 236 members was held at noon, and a picket line established at 1:00 p. m.

---

3. Sympathy strikes are legitimate Union activity. Cf. N.L.R.B. v. Peter Cailler Kohler Swiss Choc. Co., 130 F.2d 503 (2d Cir. 1942). But sympathy strikers are only entitled to the same statutory protection as the economic strikers whom they support. N.L.R.B. v. City Yellow Cab Co., 344 F.2d 575 (6th Cir. 1965).

Therefore, if the instant strike was merely a sympathy strike, the Respondent would not be required to reinstate the strikers as ordered by the Board. Cf. N.L.R.B. v. Mackay Radio & Telegraph Company, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).

The Teamsters' dispute, however, was settled almost two months before the unfair labor practice proceeding under review was instituted. At that time Local 236 was still out on strike and so far as the record indicates is still striking against the Respondent. Also prior to August 17th, Respondent's attorney had been informed by a Union representative that if the Teamsters struck Local 236 would strike and that it's official position would be that its patience had run out because of Respondent's refusal to bargain. In addition another Union official testified that at the noon meeting on August 17th the members of Local 236 voted to strike because of the Respondent's refusal to bargain.[4] His testimony is corroborated by communications between the Respondent and the Union, and by the continuation of Local 236's strike long after the settlement of the dispute between the Teamsters and the Respondent.

Although sympathy with the Teamsters' Local migh'..have been one cause of the strike, it seems clear from the record as a whole that the Board could validly determine that Respondent's unfair labor practice was also a cause of the strike. As long as one cause of the strike is the employers unfair labor practice that finding is sufficient to support the Board's determination that the strike is an unfair labor practice strike. N. L. R. B. v. Sea-Land Service, Inc., 356 F.2d 955 (1st Cir. 1966); N. L. R. B. v. A. Sartorius & Co., 140 F.2d 203 (2nd Cir. 1944); N. L. R. B. v. Stilley Plywood Co., Inc., 199 F.2d 319 (4th Cir. 1952); Butcher Boy Refrigerator Door Company v. N. L. R. B., 290 F.2d 22 (7th Cir. 1961). A similar rule has been applied to a Union's expulsion of a member. Philadelphia Moving Picture Machine Operator's Union, Local No. 307 v. N. L. R. B., 382 F.2d 598 (3rd Cir. 1967). Having violated the Act, the Respondent cannot choose the one of several causes of the strike that is most favorable to its position.

Since the Board's findings are supported by substantial evidence in the record as a whole, the petition to enforce the order of the Board is granted.

---

4. Because of the substantial corroboration of the testimony of this witness, we find no conflict between the Board's crediting of his testimony and this

Court's decision in N.L.R.B. v. Ogle Protection Service, Inc., 375 F.2d 497 (6th Cir. 1967).