**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**A. G. POLLARD COMPANY, Respondent.**

**UNITED STATES FIDELITY AND GUARANTY COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 6995, 7015.**

United States Court of Appeals First Circuit.

April 18, 1968.

240

Warren M. Davison, Washington, D. C., Atty., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Michael N. Sohn, and Abigail Cooley, Baskir, Attys., Washington, D. C., were on brief, for National Labor Relations Board.

Robert H. Goldman, Lowell, Mass., with whom Harold Rosenwald, Glen B. Smith, and Goldman, Goldman, Curtis, Cashman & Rosenwald, Lowell, Mass., were on brief, for A. G. Pollard Co.

Lawrence M. Kearns, Boston, Mass., with whom Arthur P. Menard, Boston, Mass., Jay S. Siegel, Hartford, Conn., and Morgan, Brown, Kearns & Joy, Boston, Mass., were on brief, for United States Fidelity and Guaranty Co.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

■■■ We will treat these petitions arising out of two orders to enforce union recognition in a single opinion because of the similarity of the questions.[1] The facts are relatively simple. In No. 6995, involving a local department store, the A. G. Pollard Co., the representatives of the union[2] at an employee meeting the night before the election allegedly told the employees that the company was planning to discharge a number of union adherents if the union lost. The Regional Director held, without ultimately resolving the testimony which divided over this issue, that if such a statement had been made "it contained neither assertions which the employees could not evaluate nor threats within the Union's power to carry out," citing Rio de Oro Uranium

---

1. In addition, in case No. 6995 there is a dispute over the Board's counting one ballot in favor of the union. On this ballot there had been inserted in the square under "Yes," instead of the requested "X", a single heavy diagonal, made, apparently, with more than one stroke of the pencil. All of the rest of the square was neatly filled with lighter lines, essentially parallel to the diagonal. There was no marking in the "No" square.

The company's suggestion that the vote should be counted as a "No" is unworthy of comment. Its alternative contention that the ballot should be considered totally obscure raises a close question. If the lines were intended to be obliterations, there was no vote. If they were but otiose, the voter had still failed to complete the designated symbol. Nonethe-

less, it is not necessary to use the requested symbol if one's intention is otherwise indicated. De Petrillo v. Registrars of Voters of Rehoboth, 1961, 342 Mass. 13, 171 N.E.2d 843; cf. NLRB v. Whitinsville Spinning Ring Co., 1 Cir., 1952, 199 F.2d 585. The Regional Director's finding that the intent was "clear" we could not agree with. However, having in mind that the "No" square was left untouched, and that it would be reasonable to expect purposeful obliteration to be more obtrusive, we will not say that the Board could not find that the voter intended to leave an emphasized square rather than an avoided one.

2. Retail Store Employees Union Local 372, a/w Retail Clerks International Ass'n, AFL-CIO.

Mines, Inc., 1958, 120 N.L.R.B. 91, 94, and confirmed the election.

In No. 7015 the unit involved was the Connecticut claim adjusters of a national bonding company, United States Fidelity and Guaranty Company. The night before and the morning of the election one Stashio, an adjuster at the employer's Boston office and the leading nonprofessional organizer of the union's[3] organizational drive there, according to the Regional Director's findings telephoned "a significant number" of the Connecticut adjusters and informed them that at the "Boston office some five years before, there had taken place another 'union election', which the Union lost, and that, within a period of about three years thereafter, of the sixteen adjusters who took part in the voting, nine had been involuntarily terminated. * * * To some, he also noted that only one or two of the terminated employees were able to relocate in the industry. He did not state, *in haec verba*, that these men were discharged because they voted for, or otherwise supported, the other Union's abortive organizational effort, although several of the employee witnesses stated that they had no difficulty in drawing this inference. * * * Also, to some of the employee witnesses, he indicated that the Employer would follow the same policy it had effectuated in its former union experience—that it would bring about terminations of the Connecticut adjusters, but that this would take a period of years, during which time it would 'build up' a case against them by devious means."

Again, the Regional Director worked from a premise that the statements made were inaccurate.[4] Although he made a more detailed analysis in this case, his conclusion was the same, that the statements " 'contain(ed) neither assertions which the employees could not evaluate nor threats within the union's power to carry out,' " again citing Rio de Oro Uranium Mines, Inc., supra.

Following the confirmation of the election in each case the employer refused to deal with the union. The Board's subsequent finding of section 8(a) (5) and 8(a) (1) violations raises the propriety of the director's action.

Discussion of this matter in the rubric of threats not within the union's power to carry out was inappropriate. These were not union threats. The question, as in NLRB v. Trancoa Chemical Corp., 1 Cir., 1962, 303 F.2d 456, was simply whether there was a substantially inaccurate statement as to the existence of a material circumstance likely to influence the employees' voting and hence affecting their freedom of choice; in other words, whether there was a substantial and material misrepresentation likely to be believed.

■ In A. G. Pollard there were adequate grounds for the director's finding that the assertions were capable of evaluation by the employees, that they were not such as to induce reliance. It was a permissible inference to conclude that the employees would regard the union agent's statement of the company's intentions, if not as union propaganda, at least as

---

3. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, Local 191.

4. In its brief the Board states that the director made a finding. This was imprecise. Although much of the director's opinion strongly suggests that he was accepting the employer's testimony that Stashio's statements were broadly untrue, his ultimate disposition was merely that "for present purposes it will be assumed that Stashio's remarks were not factually accurate." The director's explanation for this was that the truth or falsity of what

Stashio had said could not have been determined without unfair labor practice proceedings. The absurdity of this (for which the blame does not rest solely on the director, see Craft Manufacturing Co., 1958, 122 N.L.R.B. 341, 343) needs little comment. Even the commission of a criminal act can be adequately determined for the purpose of civil proceedings although there may never have been a criminal conviction. The uncontradicted testimony, including Stashio's own admissions, warrants counsel's concession as to positive falsity of Stashio's communications.

mere uninformed prognostication of what was likely to happen.[5] The agent offered no basis for his assertion of the company's plans, nor was there any reason for the employees to suppose that he had access to its inner councils. This distinguishes the instant case from NLRB v. Trancoa Chemical Corp., supra, on which the employer relies, since there the union agent could well have been thought to have specific factual information. In No. 6995 the Board's order must be affirmed and enforced.

■ By the same token we would affirm in No. 7015 if Stashio's statement had related solely to the employer's believed future intentions. The report of its past conduct, however, was not a prognostication, but a material fact not lightly to be dismissed. What the company had done once it might be expected to repeat. Our examination of the director's reasoning and of his ultimate conclusion denying significance to Stashio's statement shows them unacceptable.

In relying upon a finding that Stashio had no "special knowledge" of the occurrences of which he spoke, the director made an inadequate analysis of what the Board said in Craft Manufacturing Co., 1958, 122 N.L.R.B. 341, and Hollywood Ceramics Co., 1962, 140 N.L.R.B. 221. In judging the effect of a misrepresentation the test cannot be whether the speaker in fact had special knowledge, but must be whether the listeners would believe that he had.[6] A misrepresentation by one having prime access to pertinent facts would be of no consequence if, for some reason, his listeners did not think him believable. On the other hand, a misrepresentation by one in fact having no knowledge at all would be effective if he was thought to be credible.

In view of Stashio's known intimate connection therewith, it is difficult to think who could be thought to know better than he the Boston situation, or be thought by the Connecticut employees more reliable. In referring to the employees' alleged "sophistication" and saying that they could be expected not to believe him because of his known pro-union views, the director was playing both sides of the street. At least as strongly he could have said that employees could have been expected not to believe a speaker known to be employer-oriented. Denigration of Stashio as not worthy of belief because he was interested and because no Board proceedings had verified the prior occurrences,[7] was either an erroneous appraisal of basic human nature that no amount of expertise can justify, or an impossible standard of what is a sufficiently trustworthy representation. The Board's order in case No. 7015 must be set aside.

5. Cf. Lynch v. Pennsylvania R.R. Co., 1947, 320 Mass. 694, 71 N.E.2d 114. There the court held that a trainman's statement that a suitcase would be safe in the car vestibule must be recognized by the passenger as "merely a prophecy." Implicit in this was the holding that insofar as it was a statement of fact, that the vestibule was a safe place, the passenger was in a sufficient position to judge the trainman's reliability.

6. In Craft Manufacturing Co. the Board spoke of facts not being within the peculiar knowledge of a party, but it is clear that the Board was speaking in the context that the employees, also, had knowledge, and were therefore in a position to evaluate the truth or falsity of what had been told them. In Hollywood Ceramics Co. at 224, fn. 10, in referring to the speaker's "intimate knowledge of the subject matter," it is true that the Board did not say specifically known or believed intimate knowledge, but we believe it apparent that this is what it meant. It held that such intimacy was an added ground for inferring that the employees placed special reliance upon his statements. We do not believe that the Board meant that absence of special knowledge was, per se, a reason for holding a misrepresentation inoperative. Fraud is often committed by one having no knowledge whatever.

7. See fn. 4, supra.