**S. H. KRESS & COMPANY, Petitioner-Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner.**

No. 28744.

United States Court of Appeals, Fifth Circuit.

Aug. 24, 1970.

Alan D. Eisenberg, Madeline Balk, Seligman & Seligman, New York City, for petitioner; Elbert H. Coles, New York City, on the brief.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Eugene B. Granof, Daniel M. Katz, Attys., National Labor Relations Board, Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Wash., D. C., for respondent.

Before TUTTLE, THORNBERRY and INGRAHAM, Circuit Judges.

THORNBERRY, Circuit Judge:

This case is before us upon the petition of S. H. Kress & Company to review and set aside an order of the National Labor Relations Board directing the Company to recognize and bargain collectively with Tulsa General Drivers, Warehousemen and Helpers, Local Union 523, an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. The Board's bargaining order was predicated upon the results of an election that the Board conducted among certain of the Company's employees in May of 1968. There were

approximately 28 eligible voters; 18 ballots were cast for the Union, nine against the labor organization and one vote was challenged. The Company argues that because the Union made certain material misrepresentations the night before the election, the election was invalid and that therefore the Board's order directing the Company to recognize and bargain collectively with the Union should be set aside. The Board opposes the petition for review and moves for enforcement of its order. We have concluded that the Board abused its discretion, and therefore deny enforcement.

The election eve communication of which the Company complains is set out in full below, with the contested sections italicized:

## TO ALL EMPLOYEES OF S. H. KRESS WAREHOUSES

We will bring you up to date on the progress of your upcoming election which will determine if you will have the strength of the Teamsters to bargain for you or if you will stand alone. Your employer knows the strength of our Union and has called in the Top Labor Relations Man to try to brain wash you and defeat your purpose of collective bargaining. But, when an employer is "running scared," he will resort to most any tactic. On Mar. 1, 1967, over 8,000 T.V. and Radio Studio employees voted overwhelmingly to become affiliated with the Teamsters and stated that they knew the strength of the 1.7 million members of the Teamsters Union. You need this strength, too.

Every business representative of this Local Union worked as a truck driver, dockman, milkman or warehouseman before the other members chose them as representatives. They are fully familiar with the problems You face.

*All Union contracts provide that seniority shall prevail in matters of layoff, promotions, and scheduling of vacations, etc. It further states that the employer shall not discharge any employee without just cause and shall* give at least one warning letter of the complaint in writing against such employee. If the employee feels he has been unjustly dealt with, he may request an investigation and if it proves that he was unjustly dealt with, He Shall Be Reinstated To His Job And Paid For All Time Lost. At the present, you have no job security and can be fired or demoted if you lose favor with the terminal manager and you have no appeal from his decision.

You came to us, seeking help! We firmly believe in helping others to help themselves. *You[r] initiation fee will be $16.00 which includes dues for the first month, and is payable after the contract is signed. The dues are $7.00 per month and the only assessment is a death assessment in the amount of $3.00* which goes into a Death Benefit Fund for the benefit of the wife. *In case of death of a member, this Local Union immediately issues a check in the amount of $1,000.00 to apply on burial expense.*

*Since this Local Union was founded in 1934, we have Never failed to secure better wages, vacations, hospital plans, pension plans, and many, many fringe benefits.* The Employees, themselves, decide the wages, working conditions and fringe benefits they want in their contract. Management is interested in your personal welfare only as long as you work for substandard wages and the company shows a nice profit from Your labors. Your employer knows that if the Union wins the election, Your wages and benefits will be greatly increased.

We are aware that your employer has granted a few benefits, but if he doesn't intend to change them or deny them in the near future, Why would he hesitate to put it in writing???

The election to be held May 10, 1968 will be by secret ballot. Neither the employer or the Union will know how you vote. Everyone should vote for his own protection and peace of mind. We ask that you give this serious consideration, discuss it with your family,

and there is no doubt in our mind that you will vote "Yes" and receive the benefits of 1.7 million other Teamster members are now receiving.

## I.

The question for this Court is simply stated: Whether the Board has reasonably exercised its discretion in determining that the election was a fair and proper one, thus entitling the elected representative to recognition by the Company. In N.L.R.B. v. Golden Age Beverage Company, 5th Cir. 1969, 415 F.2d 26, this Court took pains to state precisely the standard of review in cases such as this, and we take the liberty of quoting at length from that opinion.

Certain well established principles guide this inquiry. Most important is the wide discretion Congress has entrusted to the Board in its conduct and supervision of elections, * * * and the considerable weight which must therefore be accorded to the Board's findings, with judicial review narrowly limited to ascertaining only their reasonableness. * * * "the only question presented to the Courts in an election review is whether the Board has reasonably exercised its discretion. * * *" Whether this Court would reach the same conclusion as the Board from the conflicting evidence is immaterial, so long as the Board's finding that the election was fairly conducted is supported by substantial evidence in the record considered as a whole. * * *

Further, in reviewing the Board's disposition of the Company's objections to the election, it "must be kept in mind that the burden is on the party objecting to the conduct of the representation election to prove that there has been prejudice to the fairness of the election". * * * This is a heavy burden; it is not met by proof of mere misrepresentations or physical threats. Rather, specific evidence is required, showing not only that the unlawful acts occurred, but also that they inter-fered with the employees' exercise of free choice to such an extent that they materially affected the results of the election.

With an eye to these standards, we move to a consideration of the Company's specific objections to the Union's election-eve leaflet.

## II.

The Company's basic argument is that the alleged misrepresentations in the Union's leaflet caused the election to be conducted in less than the laboratory conditions required by the courts, so that the employees were denied an opportunity to exercise their franchise in a free and untrammelled atmosphere. The Company claims that the following statements by the Union were material misrepresentations: "Your initiation fee will be $16.00 which includes dues for the first month, and is payable after the contract is signed. The dues are $7.00 per month * * *." The Company asserts that it proved that the Union's statement concerning the sixteen dollar initiation fee was false by submitting a copy of the By-Laws of the Union, which provides that the initiation fee shall be $12.00 to $15.00 and copies of the records of another employer which showed that the Union charged those employees initiation fees of $25.00 per employee plus dues. From this evidence, the Company concludes that "[c]learly * * * the Union's statement that its initiation fee is only $16.00 is patently false."

■■ We disagree. To begin with, the Union did not state that its initiation fee was $16.00, but that "your" (meaning the Kress employees) initiation fee would be $16.00. We do not think that a showing that the initiation fee for the employees of one other employer were in excess of $16.00 is sufficient proof—if, indeed, it is any proof at all—that the initiation fee for the Kress employees was not going to be $16.00, as claimed by the Union. Nor do we think that a misrepresentation has been proved by a showing that the Union By-Laws authorize initia-

tion fees of $12.00 to $50.00. Clearly, the By-Laws give the Union the authority to charge an initiation fee of $16.00, the amount this Local claimed it was going to charge the Kress employees. The Company simply did not prove that the Union falsified the facts in stating that the initiation fee for the Company's employees was going to be $16.00.

The Company also contends that the Union's statement that dues would be $7.00 per month was plainly false. To prove this, the Company offered evidence showing that other members of this Local, employed by other employers in the area, pay union dues of $8.00 per month. Again, we do not think that the Union's promise of seven dollar dues to the Company's employees can be held to be a material misrepresentation on the mere showing that the employees of one other employer were paying eight dollar monthly dues. There is no reason to conclude that all Union members, regardless of the employer worked for, would pay the same dues. The Company simply has not met its heavy burden of proving that this was a misrepresentation at all, much less one that interfered with the free choice of the Company's employees.

### III.

We now proceed to a consideration of the statements in the Union's leaflet that we think produced an invalid election. We will discuss the Company's and the Board's position on each of these statements and will then discuss the reasons we think the Board's order should be set aside.

One of the contested statements is, "In case of death of a member, this Local Union immediately issues a check in the amount of $1,000.00 to apply on burial expense." The Company argues that it is untrue that the Union automatically or immediately issues to the beneficiary of a deceased employee a check for $1,-000. The Company submitted to the Regional Director a copy of the Union's By-Laws, which do not provide for a set death benefit of $1,000, but for a sum not to exceed $1,000. Moreover, argues the Company, there are numerous contingencies upon the payment, and the amount of, the Union's death benefit. For example, the Union's By-Laws provide that no benefit is payable unless the member has paid in full all dues for three consecutive months and has paid in full the initiation fee and all fines and assessments. The By-Laws also provide that no benefit is payable upon the death of members holding reinstatement cards and, in the case of reinstated members, the death benefit is not payable until after dues for at least three consecutive months have been paid.

The Board counters that the Union does in fact have a death benefit fund to ensure that there would be enough money available—as much as $1,000—to bury a deceased member decently and without putting an excessive burden on the decedent's surviving relatives. It is this which was likely to be important as a selling point to prospective members, and not whether the death payment might be less if the burial expenses were less or whether a member had to keep his obligations towards the Union up to date to retain his eligibility for the payment. Moreover, it would seem obvious, without the Union specifically having to point it out that those who joined the Union could not expect to receive the monetary benefits of membership without at the same time meeting their financial responsibilities as members. The Board concludes that the omission of the contingencies pointed to by the Company did not render the Union's leaflet materially inaccurate in the context of an election campaign.

Further contested statements are: "All Union contracts provide that seniority shall prevail in matters of lay-off, promotions, and scheduling of vacations, etc. It further states that the employer shall not discharge any employee without just cause and shall give at least one warning letter of the complaint in writing against such employees." The Union, then, told the employees that *all* of its contracts provide that seniority shall prevail in matters of lay-off, promotions

and scheduling of vacations and implied that *all* of its contracts contain provisions whereby an employer cannot discharge an employee without just cause and that the employer must give at least one warning letter of the complaint against such employee. The Company adequately proved that it was false to state that *all* Union contracts contained the provisions claimed in the leaflet. For example, in two of the Union's contracts with employers in the same area as the Company, there are no provisions whatever for seniority to apply to promotions. In six other Union contracts ability to perform the job is the prevailing factor in lay-offs and seniority is but a secondary factor. The Company also presented a number of contracts between the Union and area employers in which selection of vacations is not controlled by seniority, but rather is subject to the approval of the employer.

Additionally, all of the Union's contracts do not provide that prior to dismissal the employer shall give the employee at least one warning letter of the complaint. The Company presented to the Regional Director copies of the Union's contracts with two employers in which there is no provision whatever for any type of warning letter prior to discharge. Moreover, in five other contracts submitted by the Company, the requirement of warning letters do not apply in numerous cases, including such incidents as abusiveness, recklessness, dishonesty and drinking.

The Board argues that the Union's leaflet did not materially misrepresent the terms of its contracts with other employers because those other contracts did in fact make seniority an important factor with respect to promotions, lay-offs and vacations. The Board also contends that it would be unlikely that the employees would have interpreted the Union's statement, or that it could be so read, as indicating that seniority would be the *exclusive* factor in these matters regardless of ability or the employer's need for particular skills at a particular time. The Board, however, does not deny that all the Union contracts did not actually "provide that seniority shall prevail in matters of lay-off, promotions, and scheduling of vacations, etc."

The Board submits that the Union's statement that its contracts required "at least one warning letter of the complaint" before the employee could be discharged for cause was not seriously misleading even though it is admitted that some union contracts contained certain excepted offenses for which no warning letter was necessary. The Board thinks it is plain, as a matter of ordinary common sense, that the Company's employees could recognize that there were areas of misconduct beyond the pale of warning letters and for which immediate discharge would be permissible punishment.

Finally, the Company attacks the Union's statement that since it was founded in 1934, it had never failed to secure better wages, vacations, hospital and pension benefits, and other fringe benefits. To prove the alleged falsity of this statement, the Company submitted to the Regional Director copies of the contracts between the Union and six area employers in which there are no provisions whatsoever for hospitalization plans. The Company also established that there were no provisions whatever for pension plans in the Union's contracts with eight employers. The Board counters by stating that the Union's campaign statement is couched in general terms, and is similar in nature to the vague assertions of putative virtue common in advertising for products and services as well as for political candidates. This "puffing," argues the Board, would not impair the conditions necessary for a fair election.

■ We have determined, after a careful consideration of the facts of this case, that the misrepresentations contained in the Union's eleventh hour leaflet, taken as a whole, prevented the representation election from being conducted under conditions wherein the employees were assured an opportunity to exercise their franchise in a free and untrammelled atmosphere. We find that

the Union's statements concerning its contracts with other employers and its death benefit program were misrepresentations. We are careful to note that any one of the misrepresentations, standing alone, or all the misrepresentations communicated at an earlier date, might have been insufficient to invalidate the election. We hold, however, that these misrepresentations, relating to important areas of employee concern, having been serious departures from the whole truth and having been communicated to the employees only the night before the election, a time which afforded the Company no reasonable opportunity to respond, resulted in a significant interference with the free choice of the employees.

This holding is consistent with the tests formulated by the Board itself for determining the legitimacy of campaign communications. Those tests are: (a) Whether the party making the misrepresentation was in an authoritative position to know the truth or had special knowledge of the facts, United States Gypsum Company, 130 NLRB 901; The Gummed Products Company, 112 NLRB 1092; (b) whether the employees had independent knowledge of the misrepresented fact so that they could effectively evaluate the propaganda, The Cleveland Trencher Company, 130 NLRB 600; The Calidyne Company, 117 NLRB 1062; and (c) whether the other party to the election had an adequate opportunity to reply to and correct the misrepresentation, Hollywood Ceramics Company, Inc., 140 NLRB 221.

All three tests were met in this case. First, the Union was clearly in an authoritative position to know the terms of its own contracts and death benefit plan. Since such information is in the special knowledge of the Union, the employees would give special weight to the Union's misrepresentation of its own contracts and death benefits. Secondly, the Company's employees, not being members of the Union, had no independent knowledge of the Union's contracts and death benefit plan and therefore could not effectively evaluate the propaganda. Lastly, and clearly most importantly in the context of this case, the Company did not have an opportunity to reply to and correct the misrepresentations since the Union's leaflet was not received by the employees until the night before the election. Some exaggeration, some misstatement, some departure from the whole truth can be expected in any election campaign, including a representation election campaign. Usually, such errant statements can be tolerated, in the expectation that the opponent's response and the electorate's good sense will compensate for the falsity contained in the statements. In this case, however, the Union saw to it that the Company would have no opportunity to counter the falsities or half-truths contained in the election-eve leaflet, and the employees could not have been expected to divine the truth for themselves under these circumstances. See NLRB v. Houston Chronicle Publishing Co., 5th Cir. 1962, 300 F.2d 273.

For the reasons discussed above we have concluded that the Company has met its heavy burden of proving that the Union's misrepresentations "interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." N. L. R. B. v. Golden Age Beverage Company, *supra*, 415 F.2d at 30. We therefore hold that the Board abused its discretion in certifying the Union as the employees' bargaining representative, and direct that the Board's order requiring the Company to recognize the Union be set aside.