**BAUSCH & LOMB INCORPORATED,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**United Optical Workers Union, Local 408, International Union of Electrical, Radio and Machine Workers, AFL-CIO, Intervenor.**

Nos. 31, 32, Dockets 71-1044, 71-1227.

United States Court of Appeals, Second Circuit.

Argued Sept. 15, 1971.

Decided Oct. 22, 1971.

Anderson, Circuit Judge, concurred and filed opinion.

Truman G. Searle, Nixon, Hargrave, Devans & Doyle, Rochester, N. Y. (Eugene D. Ulterino, Rochester, N. Y., of counsel), for petitioner.

Steven C. Kahn, San Francisco, Cal., Atty. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, John D. Burgoyne, Atty., Washington, D. C., on the brief), for N.L.R.B.

Richard A. Weinmann, Sipser, Weinstock & Weinmann, New York City (Leonard Liebowitz, New York City, of counsel), for intervenor.

Before KAUFMAN, ANDERSON and FEINBERG, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

This labor dispute is not a stranger to this court, having received our attention in 1968. Bausch & Lomb, Inc. v. N.L. R.B., 404 F.2d 1222 (2d Cir. 1968). Bausch & Lomb now asks us to review

an order of the National Labor Relations Board requiring the Company to bargain collectively with United Optical Workers Union, Local 408, International Union of Electrical, Radio and Machine Workers, AFL–CIO.[1] The Board has cross-petitioned for enforcement of its order, and the Union has intervened. We grant enforcement and deny the petition for review.

The Company operates 155 ophthalmic branch laboratories throughout the United States for the manufacture and wholesale distribution of optical products. On May 26, 1966, the Board conducted a secret-ballot representation election among the twelve laboratory employees at the Company's New York City Branch located on West 52nd Street. This resulted in eight employees voting against representation by the Union and four in favor. The Union filed timely objections with the Board's Regional Director, contending that the Company's election-eve letter, mailed to the employees on May 23 and received by them on May 24, contained misstatements which influenced the employees and prevented a fair election.

In particular, the Union objected to two sentences in the letter:

The Local in Minneapolis of the same union trying to represent you agreed last November that the four B & L employees represented by them will *not* receive a Christmas Bonus. The Union also agreed they will not get the new pension plan.

The Board, reversing the decision of the Regional Director,[2] determined that the omission from the letter of the critical factors which led the Minneapolis Local to give up the bonus rendered the statements misleading and ordered a second election. At the same time, the Board denied the Company's request for a hearing on the ground that the Company had not substantially controverted the facts set forth in the Regional Director's report.

In the second election, conducted nearly twelve months after the first, seven of the twelve votes were cast in favor of the Union. The Board overruled the Company's objections to the second election and certified the Union as the exclusive bargaining representative of the New York unit. When the Company refused to bargain with the Union, maintaining that the Board had improperly set aside the first election and ordered the second election, the Board found that the Company had committed an unfair labor practice in contravention of Section 8(a) (1) and (5) of the National Labor Relations Act. In its first petition to this Court, we refused to enforce the Board's order requiring the Company to bargain on the ground that the Board should have afforded the Company a hearing before it overturned the first election. Accordingly, we remanded the case to the Board. After a hearing dealing extensively with the Minneapolis negotiations, the Board reaffirmed its position and issued the order reviewed here.[3] 185 NLRB No. 62 (1970).

The Company urges three grounds for denying enforcement of the Board's order and for reinstating the first election: (1) that the Board's conclusion that the letter contained a material misstatement is not supported by substantial evidence; (2) that the Board abused its discretion in overturning the first election; and (3) that the Board,

---

1. The order also requires the Company to cease and desist from the unfair labor practices found and to post appropriate notices.

2. The Regional Director concluded that the statements "reasonably may be expected to have had a significant impact on the election," but found that the Union failed to prove they presented "inaccuracies."

3. The Board rejected the Trial Examiner's finding that the statement concerning the new pension plan was misleading, reversing its earlier conclusion. It adopted his finding with respect to the statement concerning the Christmas Bonus, however, and found this misstatement was sufficient to have warranted overturning the first election.

in overturning the election, violated Section 8(c) of the Act and unconstitutionally abridged the Company's freedom of speech.

## I.

█ As we have indicated, the Board specified that the statement "[t]he Local in Minneapolis of the same union trying to represent you agreed last November that the four B & L employees represented by them will not receive a Christmas bonus" "created the false impression that the Minneapolis Local gave up the valuable right of the Minneapolis employees to receive the Christmas bonus without receiving anything in return * * *." The Company contends that although the Minneapolis employees were granted five days extra extended illness pay, this benefit was not obtained by the union negotiators in exchange for the Christmas bonus exclusion clause. Rather, it maintains, the Company and the Minneapolis Local engaged in "item" bargaining and that agreement on any one item was divorced from agreement on any other item in the new contract. The Board and the Union respond that the record establishes that the parties engaged in so-called "package" bargaining.

The great weight which the company places upon the significance of the distinction between "item" and "package" bargaining escapes us. Good faith collective bargaining ordinarily entails a process of give-and-take. *Cf.* N.L.R.B. v. General Electric Company, 418 F.2d 736 (2d Cir. 1969), cert. denied, 397 U. S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970). In any event, in the instant case we do not have to rely upon any theoretical basis of the collective bargaining process to sustain the Board's finding, since there is substantial evidence in the record to support the Board's position that the parties engaged in "package" bargaining.

As we focus on the 1965 Minneapolis negotiations, we observe that the Minneapolis Local submitted a proposal, which, among other requests, sought an increase in wages, added sick leave, a ten-minute rest period in the morning and afternoon, a bonus equal to that in the Company's other plants and a contract which would endure for thirty months. At the first bargaining session, the Company presented a counter-proposal which rejected all union demands and called for a smaller increase in wages, a one-year contract period and a bonus exclusion clause. After some discussion, the parties agreed to the ten-minute rest periods and to a five-day extension of the Company's extended illness provision. The Union then lowered its demands for a wage increase and shortened the proposed contract period to a two-year term, offering in return to accept a bonus exclusion clause. When the Company opened the next bargaining session with a somewhat smaller wage offer but was ready also to agree to a two-year contract, the Minneapolis Local accepted. The two-year contract, as finally adopted, contained a bonus exclusion clause, five extra days of extended illness pay, ten-minute rest periods and a wage increase.

Although it is true that the parties had agreed to the bonus exclusion clause at the second session, whereas they had come to an understanding on the rest period and extended illness provisions at the first session more than a month earlier, agreement on items was contingent upon the parties arriving at a total package acceptable to each side. In light of this give-and-take method of bargaining so commonly encountered, it is clear to us from the record that the Minneapolis Local agreed to the bonus exclusion provision because it had gained concessions and was hoping to gain further concessions.

## II.

The Board, in exercising the discretion entrusted to it by Congress, consistently has sought to conduct elections under "laboratory conditions" that are not tarnished by "[c]onduct that creates an atmosphere which renders improbable a free choice." General Shoe Corporation,

77 NLRB 124 (1948). In this instance the Board determined that the Company's omission which resulted in its telling half a story—naturally that half most favorable to it—was indeed a half-truth and misstatement. This, it held, violated the well-established standard of Hollywood Ceramics Company, 140 NLRB 221, 224 (1962):

> We believe that an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election. (Footnote omitted.)

We found above that there is substantial evidence to sustain the Board's finding that the statement in question was a misrepresentation,[4] and we need not tarry long in sustaining the finding that the Union did not have time to formulate and distribute an effective reply.

We note, in this connection, that the Company did not challenge this finding. Wholly aside from this, we are convinced that the Union did not have sufficient time. The employees received the challenged letter two days before the election. Assuming *arguendo* that the Union had been informed promptly of the letter (and we are not aware of anything in the record so indicating), we are of the view that the Union would have been hard-pressed to frame a reply in the short period remaining before the election. The Company's letter did not only refer to Minneapolis, but also referred to other locals where the Union

was "voted-out" or had abandoned the employees.[5] The Union would have had to identify the locals referred to in the letter—Minneapolis, Omaha and Lincoln, Evansville and Kansas City—locate their respective business managers and then make a judgment as to the truth of each of the Company's assertions. The Union then would have been compelled to draft its response with great care, lest it run afoul of *Hollywood Ceramics*.

The *Hollywood Ceramics* requirement —that the misstatement "may reasonably be expected to have a significant impact on the election"—calls for further discussion.

The misstatement in issue meets the traditional Board tests approved by the courts for determining impact: (1) the misrepresentation was of a material fact; (2) the Union did not have time to reply; (3) the Company was in an authoritative position to have special knowledge of the facts; and (4) the employees lacked the independent knowledge with which to evaluate the statement. *See, e. g.*, N.L.R.B. v. Southern Foods, Inc., 434 F.2d 717, 720 (5th Cir. 1970); N.L.R.B. v. Trancoa Chemical Corp., 303 F.2d 456, 460 (1st Cir. 1962); *Hollywood Ceramics, supra*, at 223. Certainly, it was highly relevant to the New York employees that the union seeking to represent them had given up significant benefits in another plant without being told that it received something in return. And it is entirely reasonable to conclude that the employees, totally unfamiliar with the Minneapolis negotiations, attached great weight to the Company's statement—the effect the Company sought when it sent the letter —because the Company had itself participated in the negotiations in Minneap-

---

4. We agree with the Board that it is irrelevant under the *Hollywood Ceramics* doctrine whether the Company's deception was accomplished by omission, and thus a half-truth, rather than through a specific misstatement.

5. The fourth paragraph of the letter stated: This Company has had dealings with other locals of this Union. In Omaha

and Lincoln, Nebraska, the people became dissatisfied with the Union and voted it out. In Evansville the Union abandoned the people. In Kansas City the Union struck for several months, and the strikers had to be permanently replaced. Since that time the union has been voted out. These are probably facts that the Union hasn't told you about.

olis. It cannot be questioned that the Company's potent letter at this late hour was intended to influence the employees; otherwise, the letter would have been a meaningless gesture which neither party to this bitter labor dispute can be accused of making.

■ The context in which the misstatement appeared buttresses our conclusion that the Board did not abuse its discretion in overturning the election.[6] The letter began with the now commonplace "clean slate" statement informing the employees that "[i]f the union wins the election all items dealing with wages, hours and working conditions are bargainable." Not satisfied to explain that the employees were not guaranteed all their current benefits, the Company obviously sought to drive home this clean slate statement with the reference to the lost Christmas bonus. But, the letter went far beyond a clean slate statement. In particular, we refer to the paragraph set forth in footnote 5:

> This Company has had dealings with other locals of this Union. In Omaha and Lincoln, Nebraska, the people became dissatisfied with the Union and voted it out. In Evansville, the Union abandoned the people. In Kansas City, the Union struck for several months, and the strikers had to be permanently replaced. Since that time the Union has been voted out. These are probably facts the Union hasn't told you about.

The Company's omission of what the Union received in return for what it conceded in Minneapolis, whether characterized euphemistically as a half-truth or a calculated misstatement, when viewed in total context, was a calculated effort to persuade employees unsophisticated in the ways of collective bargaining not to join the Union. See N.L.R.B. v. Trancoa Chemical Corp., *supra*, at 460, where the First Circuit, in stressing the significance of intentional fraud by a union, said: "It is obvious that the whole proceeding was a calculated move, at a deliberately selected moment when, due to the shortness of time to learn the true facts or effectively reach the employees, the company's ability to correct misstatements would be minimal."

The Company cites several cases which it urges compel a contrary conclusion. We find that all are distinguishable on their facts. For example, in Follett Corp. v. N.L.R.B., 397 F.2d 91 (7th Cir. 1968), the court upheld the Board's refusal to set aside an election although the union had told the employees that employees of a unionized competitor were making $2.42, whereas in fact they were making only $2.35. The court agreed that the misstatement was not material because the employees of the company in negotiations were earning only $1.45 to $1.80.

### III.

Finally, the Company argues that the imposition of "laboratory standards" violates Section 8(c) of the Act and unconstitutionally abridges its freedom of speech.

■ We agree with the Third and Ninth Circuits that Section 8(c) does not limit the Board's discretion in determining whether an election was conducted under "laboratory" conditions. N.L.

---

6. The appropriate standard of review is abuse of discretion. *See, e. g.,* S. H. Kress & Co. v. N.L.R.B., 430 F.2d 1234, 1236 (5th Cir. 1970); Follett Corp. v. N.L.R.B., 397 F.2d 91, 94–95 (7th Cir. 1968).

In N.L.R.B. v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L. Ed. 322 (1946), the Court reiterated its position that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees. *See also* N.L.R.B. v. Waterman Steamship Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 84 L.Ed. 704 (1940).

R.B. v. Clearfield Cheese Co., 322 F.2d 89, 92 (3d Cir. 1963); Sonoco Products Co. v. N.L.R.B., 399 F.2d 835, 837 (9th Cir. 1968). That section, by its own terms, applies only to unfair labor practice determinations:

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic or visual form, *shall not constitute or be evidence of an unfair labor practice* under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit. (Emphasis added.)

Congress, by restricting expressions of views in Section 8(c) to unfair labor practice determinations, however, did not, and could not, relieve the Board from the constraints of the first amendment when it established "laboratory" conditions for representation in elections.[7] But we find that the Board, in applying the standard formulated in *Hollywood Ceramics*, has not transgressed on the first amendment.[8]

We are guided first by the Supreme Court's dictum in Linn v. United Plant Guard Workers, 383 U.S. 53, 66–67, 86 S.Ct. 657, 665, 15 L.Ed.2d 582 (1966), that the Board has the power to set aside election results where they are "the fruits of an employer's malicious libel." There can be no question that out-right misstatements or omissions which have the effect of misstatements, when considered by themselves, are not constitutionally protected. In discussing speech utilized as a tool for political ends, the Court has instructed that "the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. * * *'" Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), *quoting* Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). There are limitations, it is true, on the power of the state to punish or penalize the speaker if the penalty "chills" constitutionally protected speech. In New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), for example, the Court invalidated a state libel statute as applied to "expression critical of the official conduct of public officials," holding that false statements in that context were actionable only if made with knowledge that they were false or with reckless disregard whether they were false.

7. The Board, in concluding that Section 8 (c) has no application to representation election cases, recognized that "[t]he strictures of the first amendment, to be sure, must be considered in all cases." Dal-Tex Company, 137 NLRB 1782, 1787 n. 11 (1962).

8. The ten other Circuits have approved the standards of *Hollywood Ceramics*, although we are not aware that these courts examined the constitutional question in detail. *See, e. g.*, N.L.R.B. v. A. G. Pollard Co., 393 F.2d 239, 241–42 (1st Cir. 1968); Carlisle Paper Box Company v. N.L.R.B., 398 F.2d 1, 6 (3d Cir. 1968); N.L.R.B. v. Bata Shoe Co., 377 F.2d 821, 828–829 (4th Cir.), cert. denied, 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265 (1967); S. H. Kress & Co. v. N.L.R.B., 430 F.2d 1234, 1239 (5th Cir. 1970); N.L.R.B. v. Louisville Chair Co., 385 F.2d 922, 927 (6th Cir. 1967); Follett Corp. v. N.L.R.B., 397 F.2d 91, 95 (7th Cir. 1968); N.L.R.B. v. Lord Baltimore Press, Inc., 370 F.2d 397, 401–402 (8th Cir. 1966); Gallenkamp Stores Co. v. N.L. R.B., 402 F.2d 525, 533–535 (9th Cir. 1968); N.L.R.B. v. Gold Spot Dairy, Inc., 432 F.2d 125, 129 (10th Cir. 1970); I.B. E.W. v. N.L.R.B., 135 U.S.App.D.C. 197, 417 F.2d 1144, 1146–47, cert. denied, 396 U.S. 1004, 90 S.Ct. 556, 24 L.Ed.2d 496 (1969).

We recognize that the Board's laboratory standards may have a minimal chilling effect on both the speech of the employer and the union. The parties vying for the votes of the employees may be reluctant to express themselves fully, fearing that an unintentionally false statement will be seized upon later in overturning an election. But the incidental effects of regulation on the rights of employer and union must be weighed against the interest of employees and the public at large in free, fair and informed representation elections.[9]

We are not concerned here with "debate on public issues" which commands extra "breathing space" under the first amendment. See New York Times, *supra*, at 271–272, 84 S.Ct. 710. The analogy of public elections to labor representation elections falls short of compelling similarity. Representation elections involve a more intimate relationship between the "candidates"—union and employer—and the "electorate"—employees. In the highly charged atmosphere which surrounds representation elections, election-eve lies can have a devastating effect. It would be intolerable for this Court to condone misstatements by employer or union on the eve of an election. To do so would be to sanction free-for-all-anything-goes conduct. Such a sorry state of affairs would undermine the policies of the National Labor Relations Act and bring chaos, not peace to employer-employee relations.

Thus, we find distinguishable Mills v. Alabama, 384 U.S. 214, 84 S.Ct. 1434, 16 L.Ed.2d 484 (1966), which struck down an Alabama statute making it a crime for an editor of a daily newspaper to write and publish an editorial on election day urging people to vote in a particular manner in a general election.[10]

We believe the more compelling analogy is the SEC proxy rules which prohibit any misleading statements in literature soliciting proxies for a corporate election. This Court, faced with the contention that "stockholder disputes should be viewed in the eyes of the law just as are political contests, with each side free to hurl charges with comparative unrestraint, the assumption being that the opposing side is then at liberty to refute and thus effectively deflate the 'campaign oratory,'" upheld the constitutionality of the rules. S.E.C. v. May, 229 F.2d 123 (2d Cir. 1956).

Finally, we stress that the Board, despite *Hollywood Ceramics*, is not attempting to censor or evaluate the "mere expression of anti-union sentiment." Luxuray of New York, Division of Beaunit Corp. v. N.L.R.B., 447 F.2d 112 (2d Cir. 1971). The "mere expression of anti-union sentiment" not rooted in misstatements is *toto caelo* from outright deception. Nevertheless, the standards of *Hollywood Ceramics*, when coupled with the deference paid by re-

---

9. Section 1 of the National Labor Relations Act provides in part:

It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

Congress has entrusted the Board with broad discretion in conducting representation elections to insure fair and informed elections. *See* note 6 *supra*. *See generally* Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38–66, 82–92 (1964).

10. We also note that the statute struck down in *Mills* prohibited the editorial whether or not it contained material misrepresentations.

880

viewing courts to the expertise of the Board, give the Board wide discretion in reviewing campaign propaganda. Although we have been presented with a myriad of cases, which we will not even attempt to reconcile because of their divergent factual settings, we have not been presented with any convincing evidence that the Board has applied a "double standard" by overturning employer victories more readily than union victories. Certainly, the Board must recognize that the standards approved in this case must be applied carefully and even-handedly to both union and employer speech.

Petition for review denied; order enforced.

ANDERSON, Circuit Judge (concurring):

I concur in Judge Kaufman's opinion which supports the Board's contention that on the record as a whole there is ample evidence to justify its finding "that the misrepresentation here was highly likely to affect the outcome of the election." The Board, however, in its brief and oral argument asserted that "the test is not whether employees were actually or necessarily misled, but only that it is 'sufficiently likely that it cannot be told whether they were or not.'" For this proposition the Board cites Baumritter Corp. v. NLRB, 386 F. 2d 117, 120 (1 Cir. 1967) and NLRB v. Clearfield Cheese Co., 322 F.2d 89, 93–94 (3 Cir. 1963). As I read the opinion in the present case, it in no way expresses or implies approval or adoption of the Board's statement of the test as the one to be used in cases such as this where, as the Regional Director found, the statement made by the employer was literally true, but it did not describe its context or tell the whole story. The adoption of the test asserted by the Board in these circumstances would lead to a deprivation of the employer's First Amendment right to freedom of speech at the mere whimsey of the Board.