**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CACTUS DRILLING CORPORATION, Respondent.**

No. 30767.

United States Court of Appeals, Fifth Circuit.

Feb. 9, 1972.

Rehearing and Rehearing En Banc Denied March 31, 1972.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., John H. Ferguson, Atty., Elmer P. Davis, Director, Region 16, N. L. R. B., Fort Worth, Tex., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Robert E. Williams, Attys., N. L. R. B., Washington, D. C., for petitioner.

W. A. Thurmond, Scott, Hulse, Marshall & Feuille, and Stephen B. Tatem, Jr., El Paso, Tex., for respondent.

Before TUTTLE, THORNBERRY and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

During 1966 the Union [1] began a stepped up drive to organize all oil field roughnecks in the Permian Basin. [2] Cactus (the employer), an oil drilling company operating in the Basin, was one of thirteen companies whose employees [3] were eligible to vote in an NLRB (the

---

1. International Union of Operating Engineers (the Union).

2. The Permian Basin is an area of 95,000 square miles in western Texas and eastern New Mexico.

3. In conducting the election for Cactus, the NLRB employed its Hondo eligibility rule, which extended not only to current roughnecks employed but also to all roughnecks who had been with the company for a minimum of ten working days during the ninety calendar day period preceding the issuance of the election order, and who had not been terminated for cause or quit voluntarily prior to the completion of the

Board) conducted certification election on July 14, 1967.[4]

Of 211 voting, the Union carried the election by a margin [5] of 106 for the Union and 84 against, with the remainder voting challenged ballots.

Cactus filed timely objections to the election and on June 26, 1969, the Board, on consideration of the hearing officer's report, the exceptions taken thereto and the entire record in the case, adopted both the hearing officer's findings and recommendations and certified the Union as representative of the employees in the unit.

Cactus, subsequent to the Board's certification, refused to bargain with the Union. The Union then filed unfair labor charges against the company with the NLRB Regional Director. On October 24, 1969, the Regional Director issued a complaint alleging violations of 8(a) (5) and (1) of the Act.[6] Cactus answered the complaint by affirmatively stating its refusal to bargain, but asserted the invalidity of the certification election. Because the answer raised no objections to the election which had not previously been raised and rejected by the Board in the representation proceeding, the hearing examiner granted sum-

mary judgment against Cactus, and held it in violation of 8(a) (5) and 8(a) (1). Cactus took exception to these proceedings and summary judgment before the Board, which affirmed the trial examiner and issued an order directing Cactus to cease and desist from its unlawful conduct, to bargain with the Union on request and to post the customary notices.[7]

The instant case is before this court on the Board's petition for enforcement of that order.

We have often commented on the tortuous path that certification election cases take to reach judicial review,[8] and on the scope of that review.[9] Without belaboring the scope of available review, the present posture of the case compels our consideration of the company's objection to the underlying certification election—a point which was fully explored in the representation proceedings but which was rejected without additional evidentiary development in the unfair labor practice proceedings.[10]

Concisely stated, Cactus asserts that the Union, in its pre-election campaign, used arguments which were false and which naturally deceived the eligible voters, thereby destroying the laboratory

last job for which they were employed. See N.L.R.B. v. Hondo Drilling Co., 428 F.2d 943 (5th Cir., 1970) ; N.L.R.B. v. Rod-Ric Corp., 428 F.2d 948 (5th Cir., 1970).

4. The election at Cactus was conducted pursuant to a consent certificate which had been amended to reflect that Cactus reserved its rights to dispute the use of the *Hondo* rule. See n. 3, *supra*. Since this circuit's decision in *Hondo*, Cactus has abandoned its challenge of the election of the eligibility grounds.

5. In the representation proceedings before the Regional Director and the Board, the election results were modified from 66 for the Union, 38 against, 107 challenged ballots to the figures stated in the text.

6. 29 U.S.C. § 158(a) (5), (a) (1).

7. 182 N.L.R.B. 49.

8. See e. g. N.L.R.B. v. Bill's Institutional Commissary, 418 F.2d 405 (5th Cir., 1969).

9. This court has already delineated the permissible scope of its review in and fashioned guidelines for cases of this genre. N.L.R.B. v. Southern Foods, 434 F.2d 717 (5th Cir., 1970) ; N.L.R.B. v. Golden Age Beverage Co., 415 F.2d 26 (5th Cir., 1969) ; Home Town Foods, Inc. v. N.L.R.B., 416 F.2d 392 (5th Cir., 1969). While we do not set out in full what that standard for review is, it has been applied.

10. Even given the circumspect review through the eyes of the *universal camera*, there is, unlike Tyler Pipe & Foundry v. N.L.R.B., 406 F.2d 1272 (5th Cir., 1969), sufficient evidence appearing in this record to consider the company's objections to the Union's pre-election propaganda and consequently we decline to remand for further evidentiary determinations. Compare S. H. Kress v. N.L.R.B., 430 F.2d 1234 (5th Cir., 1970).

conditions under which certification elections are to be held. The source of this claim is a letter sent by the Union's business manager, Frank Parker, sometime after July 1, 1967. The challenged portions of this piece of pre-election propaganda were as follows:

"In a recent meeting with drillers, Cactus told them they, the drillers would receive a 40¢ per hour raise if the roughnecks voted against their union on July 14, 1967.

"Cactus told the drillers they would have received this raise sooner had it not been for the effort of employees to organize, because it would have been illegal for them to grant a raise while an organizing campaign was in progress. Gentlemen, this is simply not true. In other words a lie.

\* \* \* \* \* \*

" . . . At this late date now Cactus tells drillers, who are not involved at all, that they will give them a 40¢ raise if the roughnecks vote 'NO UNion'.

\* \* \*

"You have seen even smaller raises granted and them taken away, because of refusal of some contractors to go along. Some contractors have already told us they will have to take back the raises already granted if we loose the election on July 14th."

■ This court, relying on the Board's previous pronouncements, has formulated a test for evaluating questioned campaign communications:

(1) Whether there has been a misrepresentation of a material fact;

(2) Whether the misrepresentation came from a party who was in an authoritative position to know the truth, or who had special knowledge of the facts;

(3) Whether the other party in the election had adequate opportunity to reply and to correct the misrepresentation;

(4) Whether the employees had independent knowledge of the misrepre-

sented fact so that they could effectively evaluate the propaganda.

Pepperell Manufacturing Company v. N. L. R. B., 403 F.2d 520 (5th Cir., 1968), cert. den. 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 238; National Cash Register v. N. L. R. B., 415 F.2d 1012 (5th Cir., 1969); S. H. Kress v. N. L. R. B., 430 F.2d 1234 (5th Cir., 1970).

■ Here, the Union's statements about the 40¢ per hour wage hike for drillers (supervisors) if the Union lost the election meets the first test of material misrepresentation. This test, while stated as a single standard, requires a two step finding of (a) a misrepresentation and (b) the materiality of that misrepresentation to the electorate. In this regard there was finding of a misrepresentation—for as the hearing officer found—"it is obvious from the testimony that the petitioner (Union) based its propaganda statement on rumor and the truth of the statement is unsupported by the evidence." Secondly, whether this misrepresentation was material was disputed before the hearing officer who concluded: "However the statement related to the drillers and not to the electorate." In our view this conclusion is unsupported by substantial evidence or by the record taken as a whole, which affirmatively demonstrates that at the time in question Cactus, as a matter of policy, gave its roughnecks raises which were substantially coterminous with those given the drillers. The wage statements, therefore, were material and " 'not mere prattle'—or puffery; 'they are the stuff of life for Unions and members, the selfsame subjects concerning which men organize and elect their representatives to bargain.' " N. L. R. B. v. Southern Foods, Inc., 434 F.2d 717, 720 (5th Cir., 1970), quoting with approval National Cash Register Co. v. N. L. R. B., 415 F.2d 1012 (5th Cir. 1969). The same analysis, however, reveals that this piece of election propaganda would be a subject of interest to the electorate and would constitute material of which they would have had independent knowledge so that they could effectively evalu-

ate the propaganda. Compare S. H. Kress v. N. L. R. B., *supra*.

■ The Union's other statement concerning wage rollbacks, however, meets all four tests. First, it was a misrepresentation: for, as the hearing officer found, the thrust of whatever it was that other unnamed companies had told Parker was not that their actions would come whether the Union won or lost at Cactus, but whether Cactus would continue to underprice them by refusing to grant a wage increase as the Union had requested and as most of the other drilling contractors in the Basin had done.[11] That the statement was material can be readily seen and becomes immediately apparent when it is remembered that the statement comes from a letter addressed to all eligible Cactus voters. Those eligible to vote included not only those employed by Cactus, but under the Hondo [12] eligibility formula also included all roughnecks who had been employed for a minimum of ten working days during the ninety calendar day period preceding the issuance of the notice of election and who had not been terminated for cause or quit voluntarily prior to completion of the last job for which they had been employed—a total of 131 voters.

The statement ". . . Some contractors have already told us they will have to take back raises already granted if we lose the election on July 14," was thus directed to those 131 vot-

ers who were working for some other Permian Basin driller and called upon them to protect their present wage rates by electing the Union as sole bargaining agent for Cactus' roughnecks.

Second, Parker was certainly in an authoritative position to know whether the representative(s) of unnamed company(ies) had approached the Union and what they had said to him.

■ Third, while the company may have had time to frame a reply,[13] there was no effective opportunity to correct the misrepresentation. When this point was presented initially to the hearing officer, it was rejected. The hearing officer, relying on Hollywood Ceramics, Company, Inc., 140 N.L.R.B. 221 (1962), stressed that the statements were not made at the last minute and that the employer had had ample time to reply. The principle of ample time for rebuttal grows out of the Board's proper reluctance to police and censor the statements of parties to a certification election.[14] The operation of the principle, however, is limited by the overriding consideration that the employees' freedom to make an unfettered choice between the competing factions has not been destroyed. N. L. R. B. v. Houston Chronicle Publishing Co., 300 F.2d 273 (5th Cir., 1962); N. L. R. B. v. Trinity Steel Co., 214 F.2d 120 (5th Cir., 1954); General Shoe Corp., 77 N.L.R.B. 18, 21 LRRM 1337 (1948).

11. Indeed, Cactus was a factor for the other companies in the Basin to contend with in their wage negotiations. In Warton Drilling Co., 164 N.L.R.B. 357 (1967), the economics of Permian Basin drilling contractors was considered. The Board there sustained an employer who, two days before his company's employees voted in a certification election, told his workers that his ability to obtain new contracts would be impaired and some new wells would not be drilled if the Union obligated him to pay higher wages than his competitors.

12. See footnotes 3 and 4, *supra*.

13. The statement quoted comes from a letter which was itself undated, but was mailed sometime after the Union received the list of Cactus eligible employees on June 29, 1967. The Union and N.L.R.B. have referred to the letter as that of July 3, 1967, while the company refers to it as that of July 9, 1967, when it claims to have first been alerted to the letter. From July 9 until the election on July 14, Cactus made no further election presentations to its employees, or to those eligible to vote.

14. E. g. Excelsior Underwear, Inc., 156 N.L.R.B. 1236 (1966); accord, N.L.R.B. v. Southern Food Products, 434 F.2d 717 (5th Cir., 1970).

In the factual setting of this case the Board seeks to justify its reliance on the *Hollywood Ceramics* rationale of employer opportunity to reply by calling for a balancing of interests. This argument begins with the principle enunciated in N. L. R. B. v. A. J. Tower Co., 329 U.S. 324, 330–331, 67 S.Ct. 324, 91 L.Ed. 322 (1946), that the Board in carrying out its responsibilities established safeguards necessary to insure fair and free choice in bargaining representation so as to give effect to the principle of majority rule. The court there went on to state:

> "The principle of majority rule, however, does not foreclose practical adjustment designed to protect the election machinery from the ever present dangers of abuse and fraud." 329 U.S. at 331, 67 S.Ct. at 328.

The Board takes the position that it may therefore adopt policies which, while foreseeably resulting in some infringement of the rights of particular majorities, at the same time foster the rights of all majorities by discouraging needless post-election litigation and encouraging the prompt settlement of representation questions. The Board argues that in a case of this type such a permissible balancing of interests is at the heart of its refusal to set aside elections because of misstatements which the objecting party failed to rebut during the campaign despite a clear opportunity to do so.

Without articulating a broad principle, we agree that there are proper situations for the Board's application of a balance of interest test that serve to limit future post-election litigation. See e. g. N. L. R. B. v. Decatur Transfer & Storage Co., 430 F.2d 763 (5th Cir. 1970); N. L. R. B. v. Air Control Products of St. Petersburg, Inc., 335 F.2d 245 (5th Cir., 1964). While there is also certainly a proper place for the Board's *Hollywood Ceramics* rule, in the context of this case a *strict* application of that rule is too severe.[15]

As it was observed in Tyler Pipe & Foundry v. N. L. R. B., 406 F.2d 1272 (5th Cir., 1969):

> "It seems, in passing, that the Board relies too heavily on the Company's *opportunity* to rebut the Union's misstatements. Rebuttal is significant; *opportunity* to rebut, taken alone, is a different matter. It must be remembered that the stated purpose of these proceedings is to determine the uninhibited desires of the *employees*. Too often, the battle raging between the company and the union obscures the very subject of the focus of our attention. The fact that the company or the union fails to exercise an opportunity to rebut the lies of the other is of little moment in attempting to determine the effect of those falsehoods on the employees."

We agree with that observation, especially in the context of the case at bar where any rebuttal by the employer would have been futile[16] and served only to underscore in the voters' minds the Union's poisonous misrepresentation.

Applying the fourth and final standard, the recipients of the letter ostensibly had no independent knowledge of what unnamed companies would do if

---

15. In considering Union campaign literature, the Board in *Hollywood Ceramics* stated:
   "The omission, of any identification of the plant being compared with the employer's operation could only serve to induce the employees to lend credence to the Union's assertions. Had the name of the plant and the type of work performed been disclosed, the employees might have had some basis for evaluating the information. For, they then might have learned of the actual dissimilarity of the work and skill that the two plants compared."
   140 N.L.R.B. 221 (1962).
   As further indicated at note 17 *infra*, a literal reading of this standard would seem to indicate that the Union's statements here suffered from the same vice.

16. The futility of attempting to make a rebuttal to the purported statements of unnamed representatives of unnamed companies is amply demonstrated by the present record. See note 17 *infra*.

the Union lost at Cactus. Thus they could not effectively evaluate the Union propaganda.

Had the Union's propaganda not been addressed to Hondo eligible employees and had the propaganda named a source, we might be presented with the problem of N. L. R. B. v. Louisville Chair, 385 F.2d 922 (6th Cir., 1967), cert. den. 390 U.S. 1013, 88 S.Ct. 1264, 20 L.Ed.2d 163, where the court stated:

> "Having deliberately by-passed its opportunity to reply, the respondent (employer) cannot now contend that the Union campaign material, *which was refutable*, prevented the exercise of a free choice by its employees in the election of their bargaining representative." [Emphasis supplied.] 385 F.2d at 927.

It can be seen from the italicized material that *Louisville Chair* is distinguishable. Likewise are N. L. R. B. v. Decatur Transfer & Storage Co., *supra*, and N. L. R. B. v. Agawam Food Mart, Inc., 386 F.2d 192 (1st Cir., 1967). Unlike those cases the record here affirmatively indicates that this piece of pre-election propaganda was not refutable.[17]

We *conclude, therefore, that Cactus has met the heavy burden of proving that the Union's misrepresentations "interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election."* N. L. R. B. v. Golden Age Beverage Co., supra, 415 F.2d at 30. We hold that the Board abused its discretion in certifying the Union as the employees' bargaining representative, and direct that the Board's order requiring the company to recognize and bargain with the Union be set aside.

Enforcement denied.

ON PETITION FOR REHEARING AND PETITION FOR RE-HEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

---

17. As indicated in footnote 15, *supra*, the vice of the statements in Hollywood Ceramics was that there was no identification of the plant being compared with the employer. Here, there was no indication of the contractors who may have made the statements attributed to them. In fact, the record shows that when a Cactus representative solicited responses from other drilling contractors in the Permian Basin, none would even speak to him about the possibility of wage rollbacks occurring in the Basin.